# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DANA TRAVIS,

    Plaintiff,

      v.

ILLINOIS DEPARTMENT OF
CORRECTIONS *et al.*,

    Defendants.

No. 18-cv-00282

Judge John F. Kness

## MEMORANDUM OPINION & ORDER

Plaintiff Dana Travis is a Parole Commander employed by the Illinois Department of Corrections ("IDOC"). Plaintiff is Black and a leader of the parole division's union. In 2015 and 2018, Plaintiff was suspended multiple times for allegedly violating certain IDOC administrative policies. Plaintiff argues, however, that the suspensions were both pretext for race discrimination and retaliation for union association. In Plaintiff's Third Amended Complaint, he asserts claims under Title VII for race discrimination and Section 1983 for First Amendment retaliation against IDOC, the State of Illinois, and six of his supervisors. Defendants have moved for summary judgment on all claims.

As explained below, because Plaintiff's race discrimination claim is untimely under Title VII's 90-day filing requirement, and because Plaintiff fails to produce evidence that he was suspended based on race, summary judgment against Plaintiff

is appropriate; Defendants Dixon and Baldwin are also entitled to summary judgment on the First Amendment retaliation claims because they were not personally involved with Plaintiff's 2018 suspensions—the only actionable suspensions under the applicable statute of limitations. Defendants Hilliard and Garnett, however, are not entitled to summary judgment on the First Amendment retaliation claims because there is evidence—namely, suspicious timing—that permits a reasonable factfinder to conclude that Plaintiff's union association was a motivating factor for his discipline.

## I.   BACKGROUND

### A.   The IDOC Parole Division

Plaintiff Dana Travis began his employment with Defendant Illinois Department of Corrections ("IDOC") in 2001. (Dkt. 203 ¶ 28.) Defendant IDOC's Parole Division is subdivided into five geographical districts. (*Id.* ¶ 11.) Plaintiff has always been assigned to District 1. (*Id.* ¶ 28.) In 2005, Plaintiff was promoted to Parole Commander. (*Id.*) As a Parole Commander, Plaintiff supervises several parole agents, who directly monitor parolees during the reentry process from prison. (*Id.* ¶¶ 11–12.) Plaintiff in turn is supervised by District 1's two Deputy Chiefs. (*Id.* ¶¶ 12–13, 29.) District 1's Deputy Chiefs (and all other Deputy Chiefs) are supervised by the Chief of Parole, who in turn is supervised by the Director of IDOC. (*Id.* ¶ 29.)

IDOC employees within the Parole Division, including Plaintiff, are part of a union, Local 3436 of AFSCME Council 31 (the "Union"). (*Id.* ¶ 18; Dkt. 212 ¶ 1.) Plaintiff is an active Union leader. (Dkt. 212 ¶ 1.) In 2007, Plaintiff, along with others,

initiated the unionization of the Parole Division. (*Id.*) Plaintiff then served as Chief Union Steward until early 2015, when he was elected Vice President of the Union. (*Id.* ¶ 2.) In 2019, Plaintiff was elected President of the Union. (*Id.* ¶ 1.)

Under the Collective Bargaining Agreement ("CBA") between the Union and IDOC, employees are subject to a progressive disciplinary system that includes oral reprimand, written reprimand, suspension, and discharge. (Dkt. 203 ¶ 27.) The severity of an employee's misconduct determines the degree of discipline imposed on the employee. (*Id.*) Deputy Chiefs, however, do not have the authority to suspend or discharge Parole Commanders. (*Id.* ¶ 36.) When a Deputy Chief believes that a Parole Commander has committed misconduct that may warrant suspension, the Deputy Chief must refer the Parole Commander for discipline. (*Id.* ¶ 15.) The Chief of Parole then reviews the misconduct report and determines whether the Parole Commander should be referred for an Employee Review Hearing ("ERH"). (*Id.*) A Hearing Officer conducts the ERH and issues a disciplinary recommendation. (*Id.* ¶ 16.) The Chief of Parole may approve recommended suspensions up to four days. (*Id.*) Suspensions of five days or longer, however, must be approved by the Director or the Director's designee. (*Id.*)

### B. Plaintiff is Suspended Five Times for Violating IDOC Policy

Before 2015, Plaintiff had never been formally disciplined by IDOC. (Dkt. 212 ¶ 4.) In 2015, however, Plaintiff received three suspensions: a seven-day suspension for directing parole agents to release an inmate who had an outstanding warrant and

3

was in escapee status with an adult transition center (*Id.* ¶¶ 44, 72)[1]; a one-day suspension for not "clean[ing] up" certain reports and ensuring that Plaintiff's parole agents made initial contact with parolees (Dkt. 203 ¶ 69; Dkt. 184-12 at 2; Dkt. 183-1 ¶ 65)[2]; and a five-day suspension for failing to ensure that parole agents follow-up with two parolees by the assigned date (Dkt. 203 ¶ 66; Dkt. 183-20 at 2).[3] Plaintiff denies that he committed these violations because he lacked jurisdiction over the inmate that was improperly released, he completed the reports as directed, and he directed a parole agent to contact the parolees, but the agent failed to do so. (Dkt. 201 at 3.)

Plaintiff maintained a clean disciplinary record in 2016 and 2017. But he received two additional suspensions in 2018: a three-day suspension for using a state vehicle to attend a Union function at the Drake Hotel in Chicago during work hours and failing to return to the Oakley Parole Office when directed to do so (Dkt. 203 ¶ 60–62; Dkt. 183-10 ¶ 14)[4]; and another three-day suspension for signing into work in

---

[1] Deputy Chief Deon Dixon referred Plaintiff for discipline on November 12, 2014, and Chief of Parole Jason Garnett directed that Plaintiff sit for an ERH. (*Id.* ¶ 73.) Officer Toyia Sims conducted the ERH on February 25, 2015, and recommended that Plaintiff be suspended for 10 days from April 11 through April 21, 2015. (*Id.* ¶ 73.) Chief Garnett and former Director Donald Stolworthy's designee concurred with the recommendation, but the suspension was ultimately reduced to seven days through IDOC's grievance process. (*Id.* ¶ 74; Dkt. 183-10 ¶ 18.)

[2] Officer Sims conducted the ERH leading to Plaintiff's second suspension on March 11, 2015, and recommended that Plaintiff be suspended for three days from April 22 through April 25, 2015. (Dkt. 203 ¶¶ 70–71.) Chief Garnett concurred with Sim's recommendation, but the suspension was reduced to one day through the IDOC grievance process. (*Id.* ¶ 71.)

[3] Officer Sims conducted a third ERH on March 25, 2015. (Dkt. 203 ¶ 67.) Officer Sims recommended that Plaintiff be suspended five days from May 7 through May 12, 2015. (Dkt. ¶ 68.) Chief Garnett and former Director Stolworthy's designee concurred with Sims's recommendation. (*Id.*)

[4] Officer Sims conducted Plaintiff's ERH related to the Union meeting at the Drake Hotel

4

IDOC's time-keeping system while still at his residence, thus falsifying his employment start time (Dkt. 203 ¶¶ 50, 57).[5] Again, Plaintiff denies that he committed any IDOC policy violations. According to Plaintiff, he placed the Union meeting on his itinerary, was permitted to use a state vehicle for transportation, and returned to the office when directed to do so. (Dkt. 201 at 4.) Plaintiff also maintains that his time entries conformed to his scheduled start times. (Dkt. 212 ¶ 14.)

Consistent with the progressive disciplinary system provided in the CBA, Plaintiff received an ERH before Hearing Officer Toyia Sims for each suspension, and any suspensions of at least five days were approved by the IDOC Director or Director's designee. In July 2018, Plaintiff also received a performance evaluation from Defendant Hilliard for the reporting year of May 2017 to May 2018 that rated Plaintiff as failing to meet expectations across eight categories of assessment. (Dkt. 203 ¶ 47.)

### C.  EEOC Charges and the Present Suit

Plaintiff has filed four discrimination charges with the EEOC during his employment with IDOC: the first charge filed on May 29, 2014, alleged that Plaintiff

---

on February 14, 2018. (Dkt. 203 ¶ 60.) Officer Sims recommended that Plaintiff be suspended for three days. Chief Garnett concurred with Sims's recommendation and Plaintiff was suspended from March 30 through April 2, 2018. (Dkt. 203 ¶ 63; Dkt. 183-1 ¶ 68.) At that same ERH, Officer Sims also dismissed charges against Plaintiff for failure to report to the firing range for annual qualification based on timeliness. (Dkt. 203 ¶¶ 64–65.)

[5] Defendants discovered Plaintiffs time falsification through surveillance. On May 12 and May 19, 2018, Chief Garnett directed that Plaintiff be surveilled after Deputy Chief Hilliard complained that Parole Commanders were failing to report to work despite clocking into the time-keeping system. (Dkt. 203 ¶ 50; Dkt. 212 ¶ 15; Dkt. 183-7 at 16; Dkt. 183-8 at 13.) Based on the surveillance, Plaintiff was referred for an ERH on August 15, 2018. (Dkt. 203 ¶ 56.) Sims recommended that Plaintiff be suspended for three days for falsifying his time on May 12 and 19, and Chief Garnett concurred with the recommendation. (*Id.* ¶ 58.)

was discriminated and harassed based on race from February 2013 through May 2014 (Dkt. 183-26); the second charge filed on November 3, 2014 again alleged discrimination and harassment based on race from June 2014 through November 2014, and retaliation via written reprimand for having filed the first charge (Dkt. 183-28); the third charge filed on April 23, 2015 alleged that his first two suspensions in 2015 were because of race and in retaliation for filing two previous EEOC charges (Dkt. 183-31); and the fourth (and final) charge filed on May 13, 2015 alleged that his third suspension in 2015 was because of race and in retaliation for filing the previous charges (Dkt. 183-34). The EEOC dismissed all charges and issued right to sue letters for each charge. (Dkt. 203 ¶¶ 98–101.)

Plaintiff eventually filed suit against the State of Illinois, IDOC, Acting Director of IDOC John Baldwin, Deputy Chiefs Ed Ortega, Deon Dixon, Thomas Hilliard, and Tim Christianson, and Assistant Director Jason Garnett (collectively, "Defendants"), asserting various claims arising from his employment with IDOC. (Dkt. 1; Dkt. 64.) According to Plaintiff, Defendants suspended him "based on his race and association with his union after the election of former Governor Bruce Rauner in November, 2014." (Dkt. 201 at 9.) Plaintiff alleges that then-Governor Rauner was "swept into office on the promise that unions were the enemy of the state and had to be put down." (*Id.* at 1.) Once he assumed office on January 12, 2015, then-Governor Rauner allegedly instigated an "operation to discipline mostly African American Parole Commanders who were loyal to their union brothers and sisters." (*Id.* at 1–2.) Plaintiff also alleges that his 2018 suspensions were retaliation for Plaintiff filing

class action grievances against IDOC and agreeing to testify as a witness on behalf of Percy Coleman, a fellow Union Parole Commander, in a civil service proceeding.[6] (Dkt. 201 at 4–5.)

After an order granting in part Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (the operative complaint), the claims that remain are: race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, against IDOC and the State of Illinois (Count I); First Amendment retaliation under 42 U.S.C. § 1983 against Defendants Dixon, Hilliard, Garnett, and Baldwin (Counts III and VII); discrimination based on age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, against IDOC and the State if Illinois (Count IV); and violations of Plaintiff's right to speech and association under the Illinois Constitution against Defendants Ortega, Dixon, Christianson, Hilliard, Garnett, and Baldwin (Count V).[7] (Dkt. 99.)

Defendants now seek summary judgment on all remaining claims. (Dkt. 175.) Plaintiff opposes summary judgment except on Count IV for age discrimination,

---

[6] For instance, Plaintiff maintains that he filed class action grievances against IDOC on October 17, 2017 relating to job bids and the proper assignment of personnel on April 1, 2018 relating to transfer assignments and on April 12, 2018 relating to the illegal temporary assignment of Tiffany Richmond as Defendant Garnett's personal assistant. (Dkt. 212 ¶¶ 9, 12–13.) Those grievances, however, only show that the Union generally filed the grievances but do not have Plaintiff's name or signature on them. (Dkt. 204-15 at 2; Dkt. 204-16 at 2; Dkt. 204-17 at 2.) Plaintiff's assertion that he filed grievances is thus questionable. In April 2018, Plaintiff was also named as a witness on behalf of a fellow parole commander in a civil service proceeding against IDOC. (Dkt. 212 ¶ 14; Dkt. 204-3 at 54.)

[7] Judge Robert Dow, to whom this case was previously assigned, granted Defendants' motion to dismiss (Dkt. 68) and (1) struck any references to the Illinois Human Rights Act ("IHRA") in Count I; (2) dismissed with prejudice Count II; and (3) dismissed Count V as to the State Defendants. (Dkt. 99.)

which he moves to voluntarily dismiss under Rule 41 of the Federal Rules of Civil Procedure. (Dkt. 201 at 26); *see* Fed. R. Civ. P. 41(a)(2). Defendants do not object to Plaintiff's motion. (Dkt. 213 at 1.) Accordingly, Plaintiff's claim for age discrimination under the ADEA (Count IV) is dismissed without prejudice. *Cf. Otey v. City of Fairview Heights*, 125 F. Supp. 3d 874, 881 (S.D. Ill. 2015) (denying plaintiff's Rule 41(a) motion to dismiss because defendant, who already moved for summary judgment, opposed dismissal). With respect to the remaining claims, Defendants' motion for summary judgment is granted in part and denied in part.

## II.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.    DISCUSSION

### A.    Plaintiff's Motion to Strike Defendants' Statement of Facts Under Local Rule 56.1 is Denied.

Before reaching the merits of Defendants' motion for summary judgment, the Court first addresses Plaintiff's motion to strike Defendants' Statement of Facts,

which he raises in his summary judgment response brief, for violations of Local Rule 56.1. (Dkt. 201 at 7–9.)

The Court granted Defendants' motion to file an oversized (100 paragraphs) Rule 56 Statement of Facts, *see* Local Rule 56.1(d)(5). (Dkt. 182.) Plaintiff moves to strike Defendants' Rule 56 statement in its entirety because, although numbered to 100, it contains 136 total paragraphs. (Dkt. 201 at 8.) The extra 36 paragraphs come from certain paragraphs that are broken into bulleted lists. (Dkt. 203 ¶¶ 23–26, 38, 47, 91.) These bulleted lists do not circumvent the 100-paragraph limit. They instead break out related information that could have been included in a single block of text (such as disciplinary history or IDOC policies) but have been segmented for ease of the reader. In its discretion, the Court declines to strike Defendants' statement on this basis. *See Blackhawk Molding Co., Inc. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 952 (N.D. Ill. 2006) (noting judicial discretion over Local Rule 56.1 issues).

Plaintiff also contends that Defendants violated Local Rule 56(d)(1) because the numbered paragraphs are "confusing" and not "concise" (Dkt. 201 at 8.) But the Rule 56 statement is well organized, and the paragraphs are of reasonable length. Plaintiff also moves to strike paragraphs 23, 24, 25, and 47 because they include "disparate assertions of allegedly uncontested facts" and "have the effect of multiplying the burden on Plaintiff in responding to the motion." (*Id.* at 9.) The Court disagrees that these paragraphs create an unreasonable burden upon Plaintiff and, in any event, Plaintiff was, however, able to respond to these paragraphs, and Accordingly, the motion to strike is denied.

Plaintiff contends that Defendants have "failed to confine their Statements of Material Facts to actually material facts" because Defendants include certain IDOC policies that Plaintiff allegedly violated. (Dkt. 201 at 9.) But because Plaintiff's suspensions for violating IDOC policies are at the heart of his claims, the Court exercises its discretion to deny Plaintiff's motion to strike.[8]

### B. Summary Judgment is Granted for the State Defendants on Plaintiff's Title VII Race Discrimination Claim (Count I).

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In Count I, Plaintiff alleges that Defendants IDOC and State of Illinois (the "State Defendants") violated Title VII by suspending him because of his race (Black). State Defendants, however, move for summary judgment because they say the claim is untimely, unexhausted, and Plaintiff cannot establish that he was discriminated based on his race. (Dkt. 175 at 4–5, 8–9, 10–17.) As explained below, the Court agrees that the claim is time barred and, even if it were timely, no

---

[8] In their reply brief, Defendants in turn argue that Plaintiff failed to comply with Local Rule 56.1. Defendants maintain that Plaintiff, by improperly responding to their Statement of Facts, has admitted certain facts. (Dkt. 213 at 2–5.) Defendants also argue that Plaintiff's Statement of Additional Facts asserts facts outside of Plaintiff's personal knowledge, contains speculation, and improper argumentation. (*Id.* at 5–6.) Defendants' Local Rule 56.1 arguments, however, are waived because they were raised for the first time in their reply brief. *See Peterson v. Village of Downers Grove*, 103 F. Supp. 918, 925 (N.D. Ill. 2015). In any event, the Court, consistent with its "obligations under the federal and local rules," will disregard any "unfounded assertions of fact" or statements "that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record." *Drew v. Ramos*, 2013 WL 5212343, *1 (N.D. Ill. Sept. 17, 2013).

reasonable factfinder could conclude based on the record evidence that Plaintiff was suspended based on race. As a result, Defendants are entitled to summary judgment on Plaintiffs Title VII claim.

### i.    Plaintiff's Title VII Claim is Untimely.

To bring a valid suit in federal court, a plaintiff must comply with Title VII's exhaustion and timeliness requirements. The exhaustion requirement requires that a plaintiff "fil[e] charges with the EEOC and receiv[e] a right to sue letter" before filing suit in federal court. *Chaidez v. Ford Motor Company*, 937 F.3d 998, 1004 (7th Cir. 2019). That plaintiff may then bring "only those claims that were included in the EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.* (quoting *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005)). This timeliness rule requires a plaintiff to file suit within 90 days of receiving the right to sue letter from the EEOC. *See* 42 U.S.C. § 2000e–5(f)(1); 29 U.S.C. § 626(e). The "time limit is not flexible, even for *pro se* litigants, and a one-day delay is fatal." *Davis v. Browner*, 113 F. Supp. 2d 1223, 1225 (N.D. Ill. 2000); *see Blalock v. Bethesda Lutheran Homes and Servs., Inc.*, 2002 WL 31833693, at *4 (N.D. Ill. Dec. 16, 2002) (dismissing claim as time-barred because it was filed outside the 90-day filing window).

Plaintiff filed four EEOC charges and received four right to sue letters. State Defendants contend that the 90-day period runs from the second or third letter, but Plaintiff argues that the filing period should be measured from the fourth letter. The parties agree that the Title VII claim is timely only if the filing period runs from the

fourth letter.[9] (Dkt. 176 at 4–5; Dkt. 201 at 10.) Accordingly, the Court must decide which letter is operative for purposes of the 90-day limitations period.

The 90-day period begins to run from the EEOC charge that encompasses the Title VII claim asserted in the complaint. *See Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). An EEOC charge encompasses a Title VII claim if the charge and claim share a "factual relationship," meaning they "must, at a minimum, describe the *same conduct* and implicate the *same individuals*." *Id.* at 501.

When the plaintiff files multiple EEOC charges, the question is "whether the acts of discrimination alleged in the Second EEOC Charge are 'separate and distinct events' from the acts alleged in the First EEOC Charge." *Giovanni v. Megabus USA, LLC*, 2015 WL 6449133, at *3 (N.D. Ill. Oct. 23, 2015) (quoting *Vitello v. Liturgy Training Publications*, 932 F. Supp. 1093, 1099 (N.D. Ill. 1996)). If so, then a fresh 90-day filing period (for the newly alleged discriminatory act) begins to run from the second charge. *Id.* But if the "Second EEOC Charge is based on the same facts and adverse employment event as the First EEOC Charge, [the plaintiff] should have filed suit within 90 days of receipt of the First EEOC Charge." *Id.* Otherwise, a plaintiff, by realleging an earlier discriminatory event in a subsequent EEOC charge, could

---

[9] The EEOC mailed right to sue letters on the second, third, and fourth charges on April 26, 2016, July 28, 2017, and October 16, 2017, respectively. (Dkt. 203 ¶¶ 99–101.) Plaintiff is presumed to have received the letters five days later on May 1, 2016, August 2, 2017, and October 21, 2017. *Jackson v. F.B.I.*, 2007 WL 2492069, at *5 (N.D. Ill. Aug. 28, 2007) ("Unless proven otherwise, the receipt date of notice is presumed to be five days from the mailing date." *Lloyd v. Sullivan*, 882 F.2d 218, 218 (7th Cir. 1989)). The 90-day periods then elapsed on July 30, 2016, October 31, 2017, and January 20, 2018. Plaintiff did not file his initial complaint until January 15, 2018, meaning only the fourth charge, with the 90-day period ending January 20, 2018, is timely.

"evade the [90-day] filing requirement simply by seeking additional Notice of Right to Sue." *Vitello*, 932 F. Supp. at 1098 (quoting *Lo v. Pan American World Airways, Inc.*, 787 F.2d 827, 828 (2d Cir. 1986)); *see Blalock v. Bethesda Lutheran Homes and Services, Inc.*, 2002 WL 31833693, at *3–*5 (N.D. Ill. Dec. 16, 2002) (The second charge did not restart the 90-day filing period because it was "a mere re-allegation of the first EEOC charge.").

In the Third Amended Complaint, Plaintiff alleges that he was suspended five times because of his race and in retaliation for filing previous EEOC charges of racial discrimination.[10] (Dkt. 64 ¶¶ 82–87; Dkt. 203 ¶¶ 85–87.) The suspension allegations first appear in Plaintiff's third EEOC charge, where he alleges that he was suspended twice in April 2015. (Dkt. 183-31.) The fourth charge concerns Plaintiff's third suspension one month later in May 2015.[11] (Dkt. 183-34.)

---

[10] Plaintiff's first and second EEOC charges alleged hostile work environment. According to the allegations in those charges, from February 2013 through November 2014, Defendants Ortega and Christianson harassed Plaintiff because of his race by, among other things, assigning Plaintiff a disproportionate amount of work, frequently calling Plaintiff and sending him belittling emails, repeatedly criticizing Plaintiff's work performance, and prohibiting Plaintiff from leaving the district office to supervise his parole agents. (*See* Dkt. 183-26; Dkt. 183-28.) Plaintiff includes these allegations in the Third Amended Complaint within the subsection titled "Facts Relating to Race." (Dkt. 64 ¶¶ 35–52.) Plaintiff, however, concedes in his response to Defendants' motion for summary judgment that "Count I does not allege a hostile work environment claim," but instead alleges "disparate treatment based on race." (Dkt. 201 at 26.) Moreover, in Plaintiff's response to Defendants' Rule 56.1 statement of facts, Plaintiff states that the harassment by Defendants Ortega and Christianson is "not material" and does "not form the basis of any of the claims in the [Third Amended Complaint]." (*See* Dkt. 203 ¶¶ 75–84.) Accordingly, the Court only considers Plaintiff's discrete act theory premised on the suspensions. Because Plaintiff no longer proceeds on his hostile work environment theory, Defendants' arguments that Ortega and Christianson's harassment was "minor and trivial" and not based on Plaintiff's race are rendered moot. (Dkt. 201 at 10–11, 18.)

[11] The EEOC charges do not mention Plaintiff's fourth and fifth suspensions, as these suspensions occurred after the fourth and final EEOC charge was filed.

The third and fourth charges are related because the suspensions described in them are part of the "same campaign" of discrimination and retaliation allegedly perpetrated by State Defendants. *See Little v. Ill. Dep't of Public Health*, 2017 WL 5903835, at *4 (N.D. Ill. Nov. 30, 2017) (Discriminatory acts are related if they "contribute[] to the single wrong described in the EEOC charge.") The third and fourth EEOC charges describe three suspensions that were issued by the same individuals (Defendants Dixon and Garnett) for the same alleged reasons (racial discrimination and retaliation) and occurred in close temporal proximity (under one month). (Dkt. 64 ¶¶ 61–62, 64; Dkt. 183-31; Dkt. 183-34.) The suspensions are thus "so related and intertwined in time, people, and substance" that they cannot be characterized as separate acts of discrimination. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003).

Plaintiff's description of the suspensions confirms that the third and fourth charges are related. In his response to Defendants' motion for summary judgment, Plaintiff characterizes Defendants' misconduct as "a clear and widespread *campaign* of retaliatory discipline." (Dkt. 201 at 35 (emphasis added); *see also* Dkt. 201 at 2 (Defendants executed a "thinly veiled yet distinctive *operation* to discipline mostly African American Parole Commanders. . . .") (emphasis added).) In addition, Plaintiff argues that his latter two 2018 suspensions "properly became the subject matter of this suit" because they are part of "the discrimination [that] continued to occur" after the fourth EEOC charge. (Dkt. 201 at 10; *see also* Dkt. 64 ¶ 68; Dkt. 202 ¶¶ 19–20.)

Plaintiff thus implicitly concedes that the 2018 suspensions are related to the May 2015 suspension detailed in the fourth EEOC charge; otherwise, the 2018 suspensions could not be the subject of this lawsuit. *See Snow v. Bd. of Educ. of J. Sterling Morton High School Dist. 201*, 2017 WL 478266, at *5 (N.D. Ill. Feb. 6, 2017) (discriminatory acts occurring after the plaintiff files his EEOC charge are cognizable in the resulting lawsuit only if they "are reasonably related to the allegations in [the] EEOC Charges.") But in view of Plaintiff's allegations, the Court cannot hold, when all the suspensions are alleged to have been motivated by the same reasons (race discrimination and retaliation), that the May 2015 suspension is related to the 2018 suspensions (over two years later) but not the April 2015 suspensions (one month earlier).

Moreover, that each alleged 2015 suspension is a discrete, adverse employment event actionable by itself does not preclude finding the suspensions related for purposes of the 90-day filing requirement. *See Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 857 n.11 (7th Cir. 2019); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (Each discrete act of discrimination or retaliation, such as a suspension, "constitutes a separate actionable unlawful employment practice.") (cleaned up). In *Ford*, the Seventh Circuit considered whether three denied promotions that occurred after the plaintiff filed the EEOC charge were "like or reasonably related" to the first denied promotion included within the charge. *Ford*, 942 F.3d at 857 n.11. All four denied promotions were related, according to the Seventh Circuit, because "an investigation of the first promotion could reasonably be

15

expected to have delved into the later denials that occurred in the next few months," especially because the plaintiff alleged that "the three later denials were in part retaliation against her earlier ADA-protected activity." *Id.* Similarly here, all three of Plaintiff's 2015 suspensions occurred within one month, and Plaintiff alleges that the third suspension (in the fourth charge) was in part retaliation for complaining about the earlier two suspensions (in the third charge). The fourth charge is thus not "separate and distinct" from the third charge. *Giovanni*, 2015 WL 6449133, at *3.

In sum, Plaintiff's third EEOC charge encompasses the Title VII claim because it is the first charge that alleges the discriminatory and retaliatory suspensions detailed in the Third Amended Complaint. Plaintiff's fourth charge, which alleges an addition suspension, is related to the third charge, and thus does not trigger an additional 90-day filing window. This means that Plaintiff was required to file suit within 90 days of receiving the third right to sue letter. *Id.* Plaintiff, however, filed suit beyond this 90-day period, meaning the Title VII claim is untimely. Accordingly, State Defendants are entitled to summary judgment on Count I.[12]

### ii. No Reasonable Juror Could Find that Plaintiff Was Suspended Based On Race.

Timeliness aside, Plaintiff's Title VII claim also fails on the merits. In short,

---

[12] State Defendants also contend that, if Count I was timely, summary judgment should nevertheless be granted because Plaintiff failed to exhaust his administrative remedies for "Defendant Ortega's alleged conduct and Plaintiff's suspension[s] in 2018." (Dkt. 176 at 9; Dkt. 213 at 16.) Plaintiff has abandoned any claim for hostile work environment based on Defendant Ortega's conduct. (*See* Dkt. 201 at 26; Dkt. 203 ¶¶ 75–84.) And the Court does not address whether Plaintiff exhausted the 2018 suspensions because, as stated, the Title VII claim is untimely.

Plaintiff has failed to present evidence creating a genuine issue of material fact regarding whether he suffered discrimination based on race. (Dkt. 176 at 11–17.) At summary judgment, the "singular question" in discrimination cases is "whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the [adverse employment action]." *Igasaki v. Ill. Dep't of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). There are two frameworks for analyzing employment discrimination under Title VII: (1) the *McDonnell Douglas* burden-shifting framework and (2) the holistic evidence framework. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). Plaintiff's Title VII claim fails under both frameworks.

### a. Plaintiff Cannot Establish a Prima Facie Case of Race Discrimination under *McDonnell Douglas*.

The *McDonnell Douglas* burden-shifting framework requires the plaintiff to first establish a prima face case of discrimination by demonstrating that he: (1) is a member of a protected class; (2) met the defendant's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who were not members of the protected class. *McDaniel v. Progress Bell Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). Once a prima facie case is established, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason is pretextual. *Id.*

17

State Defendants argue that Plaintiff cannot show he was meeting their legitimate expectations at the time he was suspended. (Dkt. 175 at 12–15.) Plaintiff's job performance must be looked at "through the eyes of h[is] supervisors at the time of h[is] suspension." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). Plaintiff must show that he did not violate company policy nor receive negative performance evaluations. *See Banthia v. Roche Diagnostics Operations, Inc.*, 502 Fed. App'x 571, 573 (7th Cir. 2012) (negative performance review, despite previously positive reviews, shows employee not meeting expectations); *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (employee not meeting expectations because he violated company policy).

State Defendants argue Plaintiff was not meeting expectations because his suspensions were all preceded by IDOC policy violations, as confirmed through an ERH before Officer Sims.[13] (Dkt. 175 at 12–15.) Plaintiff responds that all the disciplinary violations were false and "a mere cover, a pretext, for the discrimination." (Dkt. 201 at 23.) Plaintiff, however, presents no evidence that Officer Sims erroneously found that he violated IDOC policy in the five ERH's preceding the suspensions. Officer Sims prepared a written report detailing the alleged infraction, Plaintiff's response to the allegation, and Officer Sims's findings and

---

[13] The plaintiff is not required to show that he was meeting his employer's legitimate expectations if he "concedes that his employer had legitimate grounds to terminate him and argues that he was singled out for more severe discipline than other employees because of race, sex, national origin, etc." *Pulliam v. General Motors*, 354 F. Supp. 2d 874, 881 (W.D. Wis. 2005) (citing *Curry v. Menard, Inc.*, 270 F.3d 473 (7th Cir. 2001) and *Flores v. Preferred Technical Group*, 182 F.3d 512 (7th Cir. 1999)). This exception, however, is not applicable here because Plaintiff insists that he was meeting State Defendants' expectations.

recommendations. (*See* Dkts. 183-17–22.) The only evidence Plaintiff cites for his contention that the ERHs were a sham is his own affidavit, in which Plaintiff states that the violations were completely "false and fraudulent," he "complied with all rules and regulations," and "submitted all [exculpatory evidence] to Ms. Sims and she discarded it without consideration." (*See* Plaintiff's Affidavit, Dkt. 212 ¶¶ 4–6, 10, 17; Dkt. 204-21 ¶¶ 10–13.) Plaintiff does not explain which evidence Officer Sims ignored or submit this evidence into the summary judgment record. At summary judgment, Plaintiff's conclusory allegation that Defendants falsified violations as cover for racial discrimination does not hold water. *See Igasaki*, 988 F.3d at 958 (conclusory allegation attacking performance reviewer's veracity does not defeat summary judgment); *See King v. Schieferdecker*, 2011 WL 3273167, at *11 (C.D. Ill. Aug. 1, 2011) ("Plaintiff alleges the majority of incident reports were false, but he has offered no evidence that the reports were false."); *Gonzales v. Cook Cnty. Bureau of Admin.*, 450 F. Supp. 2d 858, 868 (N.D. Ill. July 18, 2006) (Plaintiff, who was "fired because of complaints from training recipients about his behavior . . . alleges without support that [his supervisor] gave false testimony at his pre-termination hearing.").

Deputy Chief Hilliard also issued Plaintiff a performance evaluation in 2018 that found Plaintiff's performance to be deficient in eight categories. (Dkt. 203 ¶ 47; Dkt. 183-12.) Plaintiff argues that the evaluation was "entirely false and fraudulent" because Hilliard did not first review Plaintiff's previous evaluation from 2014 as the CBA requires, and Plaintiff's " 'office stats' were top tier in the state of Illinois parole division." (Dkt. 201 at 24–25.) But whether Hilliard reviewed Plaintiff's previous

performance evaluation, which was issued before any of the suspensions here, is irrelevant to whether Hilliard genuinely believed Plaintiff was failing to meet expectations in 2018. *See Banthia*, 502 Fed. App'x at 573 ("What matters here is whether [plaintiff] was meeting [defendant's] expectations at the time of her demotion."). Moreover, Plaintiff's contention that he has "top tier stats" is vague and unsupported by record evidence: Plaintiff includes a statistical report as an exhibit (Dkt. 204-20), but he does not explain which stats equate to good performance and how these stats measure against other Parole Commanders (Dkt. 201 at 24–25). In any event, the statistical report, with data from October 2014 through February 2015, does not controvert the negative performance review that was issued in 2018. Plaintiff has thus failed to establish that he was meeting State Defendants' legitimate employment expectations.

Plaintiff also fails to identify a similarly situated, non-Black employee who was treated more favorably. Similarly situated employees "need not be 'identical in every conceivable way,' [but] they 'must be directly comparable to the plaintiff all material respects.' " *Marnocha v. St. Vincent Hospital and Health Center, Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman*, 667 F.3d at 846). In cases involving employee discipline, the plaintiff must show that he was disciplined more severely than the comparator employee despite committing the same infraction. *See Coleman*, 667 F.3d at 858 (a plaintiff must show that "similarly situated employee had been disciplined less harshly").

According to Plaintiff, since 2015, "African American employees of the Parole

20

Division, including myself, have been disciplined," but "[W]hite commanders, Leo Munis, John Rusten, Paul Anderson, Allen Hahn, and Ed Zangy, have never been disciplined." (Dkt. 201 at 25.) Plaintiff testified at his deposition, however, that these White commanders "never have been written up" and he does not "know whether or not they have violated IDOC policy in the past." (Dkt. 204-3 at 34–35.) Those other commanders are thus not similarly situated because there is no evidence that they violated the same (if any) IDOC policies. *See Coleman*, 667 F.3d at 858. Plaintiff cannot cure this deficiency merely by speculating that they committed the same violations but were given a pass. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("mere speculation and conjecture will not defeat a summary judgment motion").

Because Plaintiff fails to establish that he was meeting State Defendants' employment expectations and that similarly situated, non-Black employees were treated more favorably, he has failed to establish a prima facie case of race discrimination under *McDonnell Douglas*.

### b. When Viewed Holistically, the Evidence Does Not Show That Plaintiff was Suspended Based on Race.

Plaintiff's case also falls short under the holistic evidence framework. This framework requires a court to determine whether all the relevant evidence "would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. A court must ask "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958. Relevant evidence includes smoking-gun evidence such as a defendant's "actual admission of discriminatory

intent." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citing *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 775 (7th Cir. 2013)). Circumstantial evidence, such as evidence that the employer's stated reasons for suspending the plaintiff were pretextual, is also relevant. *See Coleman*, 667 F.3d at 852. As the Seventh Circuit made clear in *Ortiz*, all the "evidence belongs in a single pile and must be evaluated as a whole" to determine discriminatory intent. 834 F.3d at 766.

At this stage, the only supposed evidence of race discrimination that Plaintiff identifies is his affidavit, in which he alleges that the ERHs were fraudulent and that similarly situated White commanders were treated more favorably. (Dkt. 201 at 22–25.) But for the reasons discussed above when assessing Plaintiff's claim under the *McDonnell Douglas* framework, neither of these conclusory allegations is supported by the record. The Court also notes that *all* the individuals Plaintiff alleges conspired to falsify the ERHs and performance evaluation—Deputy Chiefs Hilliard and Dixon, Chief of Parole Garnett, and Officer Sims—are Black (Dkt. 203 ¶¶ 7, 9–10, 19), which further weighs against Plaintiff's claim. *Menefee v. Dynamic Educ. Sys.*, 2008 WL 4866016, at *3 n.3 (N.D. Ill. June 17, 2008) (There "can be no compelling inference of discrimination when the decision-maker is in the same protected category").

In the end, when the evidence is considered "in a single pile," which consists only of the fact that Plaintiff is a member of a protected class, no reasonable juror could find that he was suspended because of his race. State Defendants are thus entitled to summary judgment on Count I.

### C. Summary Judgment is Granted for Defendants Dixon and Baldwin, but denied for Hilliard and Garnett, on Plaintiff's First Amendment Retaliation Claims (Counts III and VII).

Plaintiff brings claims under Section 1983 for First Amendment retaliation against Defendants Dixon, Hilliard, Garnett, and Baldwin (the "Individual Defendants") (Counts III and VII). According to Plaintiff, the Individual Defendants, prompted by then-Governor Rauner's hostility towards public unions, retaliated against Plaintiff for his "union membership and, more specifically union leadership" by suspending him in 2015 and 2018. (Dkt. 201 at 1–2, 31.) Plaintiff also alleges that the 2018 suspensions were in part retaliation for Plaintiff filing grievances against Defendants and testifying on behalf of a fellow Union Parole Commander in a civil service proceeding. (*Id.* at 4–5; Dkt. 203 ¶¶ 86–87.)

Individual Defendants set forth multiple arguments for granting summary judgment. They argue that the retaliation claims are time barred under the applicable statute of limitations to the extent the claims are premised on conduct occurring before January 15, 2016. (Dkt. 176 at 5–6.) Defendants Dixon, Hilliard, and Baldwin (but not Defendant Garnett) also contend that, because they were not personally involved with Plaintiff's suspensions, they are entitled to summary judgment. (*Id.* at 6–8.) Finally, all Individual Defendants maintain that Plaintiff's retaliation claims fail because the evidence does not show that Plaintiff's Union association was a motivating factor for the suspensions. (*Id.* at 20–22.)

It is correct that the claims, if premised on conduct occurring before January 15, 2016, would be time barred. Accordingly, the Court analyzes only whether

Individual Defendants suspended Plaintiff in 2018 (not 2015) because of Union association. And because Defendants Dixon and Baldwin were not personally involved with Plaintiff's 2018 suspensions, they are entitled to summary judgment on Counts III and VII. Defendants Hilliard and Garnett, however, are not entitled to summary judgment because they were personally involved with the suspensions and there is a genuine dispute of material fact whether Plaintiff's testimony on behalf of a fellow Union Parole Commander, Percy Coleman, was a motivating factor for his 2018 suspensions.

### i. The 2015 Suspensions Are Not Actionable Because They Are Barred by the Statute of Limitations.

For claims filed under Section 1983, "courts look to the statute of limitations for personal injury in the state where the injury occurred." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006). In Illinois, where Plaintiff is employed by IDOC, the statute of limitations for personal injury actions is two years. *Id.*; *see* 725 ILCS 5/13–202. Although state law determines the applicable statute of limitations, the "accrual date of a § 1983 cause of action is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Section 1983 claims accrue "when the plaintiff knows or should know that his or her constitutional rights have been violated." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011) (quoting *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004)).

Individual Defendants argue that Counts III and VII are untimely for any conduct occurring before January 15, 2016, which is more than two years before Plaintiff filed suit on January 15, 2018. (Dkt. 175 at 5–6.) In other words, Individual Defendants contend that the three suspensions from 2015 should not be considered

24

when evaluating Plaintiff's Section 1983 claims. Plaintiff responds that the claims are timely because the retaliation was a "continuing action," and the Third Amended Complaint alleges acts of retaliation that took place after January 15, 2016.[14] (Dkt. 201 at 11.) It appears that Plaintiff, without detailed explanation, is invoking the continuing violation doctrine.[15]

The continuing violation doctrine allows a plaintiff to sue "for a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). Under this doctrine, the court treats the timely and untimely acts "as one continuous act that ends within the limitations period." *Id.* In the employment discrimination context, however, the continuing violation doctrine applies only to claims based on the existence of a hostile work environment, not discrete acts. *See Morgan*, 536 U.S. at 113 ("Discrete acts such as termination . . . are not actionable if time barred, even when they are related to [timely] acts."). Moreover, *Morgan*'s holding on "the continuing violation doctrine in the Title VII context[] applies equally to § 1983 cases." *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003). Accordingly, "any discrete acts that [the plaintiff] alleges occurred outside of the limitations period for § 1983 actions are

---

[14] Plaintiff also erroneously contends in his response brief that "all of the retaliatory actions by the Defendants took place after January 15, 2016." (Dkt. 201 at 11.) This is plainly contradicted by the summary judgment record and the Third Amended Complaint, where Plaintiff premises his First Amendment retaliation claim under Section 1983 on the three suspensions that occurred in 2015. (*See* Dkt. 64 ¶¶ 94–97.) The Court will thus disregard this errant contention.

[15] In responding to Individual Defendants' statute-of-limitations argument, Plaintiff cites no authority. (*See* Dkt. 201 at 11.) Accordingly, the Court will, perhaps charitably, interpret Plaintiff's arrgument as invoking the continuing violation doctrine.

barred." *Hildebrandt*, 347 F.3d at 1036 n.18.

Plaintiff has expressly disclaimed any hostile work environment claim. (*See* Dkt. 201 at 26; Dkt. 203 ¶¶ 75–84.) Plaintiff proceeds instead under the theory that he has been retaliated against via multiple suspensions. (Dkt. 201 at 13–15; Dkt. 64 ¶¶ 93–135, 155–76.) Each suspension is a discrete adverse employment action. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004). The suspensions are thus untimely. outside the limitations period. Plaintiff was suspended three times in April and May 2015; these suspensions are untimely because they occurred over two years before Plaintiff filed this lawsuit on January 15, 2018. Accordingly, all three 2015 suspensions "are untimely filed and no longer actionable." *Morgan*, 536 U.S. at 115.

Although Plaintiff's 2015 suspensions are untimely, he may still use the 2015 suspensions "as background evidence to support a timely claim" based on the 2017 suspensions, which remain alive in this suit. *Id.* at 113. The Court will thus consider the 2015 suspensions to the extent they are relevant to determining whether Plaintiff's 2018 suspensions were the result of First Amendment retaliation. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 402–06 (7th Cir. 2008).

### ii. Defendants Dixon and Baldwin were Not Personally Involved with Plaintiff's 2018 Suspensions.

To recover against a defendant under Section 1983, a plaintiff "must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) (cleaned up). To be "personally responsible," a defendant "must know about the conduct and facilitate it,

approve it, condone it, or turn a blind eye." *Id.* The plaintiff ultimately must show that the "deprivation of his constitutional rights would not have occurred '*but for*' the defendant's conduct." *Volk v. Coler*, 638 F. Supp. 1540, 1547 (C.D. Ill. 1986), *aff'd*, 845 F.2d 1422 (7th Cir. 1988) (quoting *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983)). Because the 2015 suspensions are time barred, the Individual Defendants may only be liable under Section 1983 if they were personally involved with the 2018 suspensions.

Defendants Hilliard, Dixon, and Baldwin (but not Defendant Garnett) contend that they were not personally involved with Plaintiff's suspensions. (Dkt. 175 at 6.) According to Defendants Hilliard and Dixon, as Deputy Chiefs, they did not have authority to suspend Plaintiff or to recommend discipline. (*Id.* at 7.) Instead, Officer Sims conducted the ERH and recommended the appropriate discipline, which was then approved by Defendant Garnett for suspensions up to four days or the IDOC Director (or his designee) for longer suspensions. (*Id.*) Defendant Baldwin also maintains that, as Acting Director of IDOC since August 15, 2015, he "did not personally review or sign off on any of Plaintiff's discipline." (*Id.*) Plaintiff responds that, regardless of Hilliard and Dixon's final disciplinary authority, they both instigated the disciplinary proceedings against Plaintiff. (Dkt. 201 at 13.) And Defendant Baldwin, according to Plaintiff, "had a direct role in employee discipline." (*Id.* at 18.)

Plaintiff alleges that Defendant Dixon "brought and presented fabricated evidence" at the ERH conducted on September 20, 2018, resulting in Plaintiff's

27

suspension for falsifying his work start time. (Dkt. 201 at 13.) Plaintiff cites to the ERH Summary and his own affidavit to support this contention. (*Id.* at 13–14.) The ERH Summary, which details the allegations, parties' arguments, and Officer Sims's findings, lists Defendant Dixon as the "Management Rep" but does not otherwise mention Dixon. (Dkt. 183-17.) Moreover, Plaintiff does not explain what actions Dixon performed as Management Rep in the disciplinary proceeding. Plaintiff also cannot substantiate his accusation of evidence fabrication through his affidavit, because the affidavit "contain[s] speculative conclusions" that are "not based on personal knowledge" or record evidence. *Fenje v. Feld*, 301 F. Supp. 2d 781, 814 (N.D. Ill. 2003). Defendant Dixon is therefore entitled to summary judgment on Counts III and VII because no reasonable factfinder could conclude, based on the record evidence, that Defendant Dixon fabricated evidence causing Plaintiff's suspensions.[16] *Volk*, 638 F. Supp. at 1547.

As to Defendant Baldwin, Plaintiff contends that Baldwin was generally

---

[16] Although not mentioned in his summary judgment response brief, Plaintiff asserts in his Rule 56 Statement of Additional Facts that "Dixon prepared a disciplinary report" for the ERH regarding falsification of time. (Dkt. 212 ¶ 15.) The Court disregards it because this assertion is not supported by citations to the record and thus violates Local Rule 56.1. *See Gabryszak v. Aurora Bull Dog Co.*, 427 F. Supp. 3d 994, 998 (N.D. Ill. 2019) (At the summary judgment phase, "compliance with Local Rule 56.1 is crucial," and "factual allegations not properly supported by citation to the record are nullities."); *see also* LR 56.1 (statements of fact must include "references to the affidavits, parts of the record, and other supporting materials relied upon."). Plaintiff also asserts in his Statement of Additional Facts that Defendant Dixon ordered the surveillance of Plaintiff's residence, which uncovered the time falsification leading to one of the 2018 suspensions. (Dkt. 212 ¶ 14.) Plaintiff cites his own affidavit as evidence, but the affidavit lacks foundation because it does not explain how Plaintiff acquired knowledge of Defendants' surveillance order. *See Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) (Because the affidavit had no "first-hand evidence" for its assertions, it "was entitled to no weight.").

involved in employee discipline. Plaintiff presents disciplinary reports of fellow Parole Commanders Austin Ware and Alexsei Norton, where Baldwin participated or signed off on the discipline. (Dkt. 201 at 18 (citing Dkt. 204-12 and 204-13).) But Baldwin's involvement with *other Parole Commanders'* discipline does not show that he was involved with *Plaintiff's* 2018 suspensions. Nor was Baldwin's participation, as the Acting Director of IDOC, required under the terms of the CBA. The IDOC Director's approval was required only for suspensions longer than four days. (Dkt. 203 ¶ 16.) Both of Plaintiff's 2018 suspensions were three days long—which is why only Defendant Garnett's sign-off was obtained. (*See* Dkt. 183-17 and 183-18.) Moreover, Defendant Baldwin cannot be held vicariously liable for Garnett's (or any other subordinate's) actions because, under Section 1983, a government official is "only liable for his or her own misconduct"; there is "no such thing as *respondeat superior* liability." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). In short, Plaintiff has presented no evidence that Defendant Baldwin played any role in either of his 2018 suspensions.

There is, however, sufficient evidence that Defendant Hilliard catalyzed both of Plaintiff's 2018 suspensions. Hilliard instigated the surveillance of Plaintiff's residence that uncovered the falsification of time. (Dkt. 201 at 15.) As stated in Defendants' Statement of Facts, Defendant Garnett ordered surveillance of Plaintiff and other parole commanders' residences "because Defendant Hilliard reported these particular commanders were not coming into work as they say they were based on their [] time-keeping histories." (Dkt. 203 ¶ 50.) Defendant Hilliard also testified at

his deposition that he discussed surveillance with Defendant Garnett and ultimately referred Plaintiff for an ERH. (Dkt. 184-6 at 43.) Hilliard was also involved in Plaintiff's suspension for attending a Union function during work hours. As described by Officer Sims in the ERH Summary, Hilliard ordered Plaintiff to return to the office for failing to provide notice of the Union event and referred Plaintiff for discipline when he failed to do so. (Dkt. 183-18 (Officer Sims believes that Hilliard's "actions towards [Plaintiff] is ensuring accountability of what had been submitted in the itinerary.").)[17] Hilliard thus played an integral role in facilitating Plaintiff's suspensions even if he lacked authority to recommend or approve the discipline imposed.[18] *See Mandewah v. Wis. Dep't of Corrections*, 2009 WL 1702089, at *7 (E.D. Wis. June 17, 2009) (even though defendant "was not the final decisionmaker, with regard to the extent of punishment, he was "involved in bringing about the resulting suspensions" because "he was responsible for reporting and writing up allegations of misconduct" and "was interviewed during the subsequent investigations.").

Defendants Dixon and Baldwin were not sufficiently involved with Plaintiff's 2018 suspensions; they are therefore entitled to summary judgment on Counts III and VII. There is evidence, however, that Defendant Hilliard was personally involved. As a result, the Court must examine whether Defendants Hilliard and Garnett could

---

[17] Plaintiff reiterates his evidence falsification allegation against Defendant Hilliard, contending that Hilliard provided false evidence at both 2018 ERHs. (Dkt. 201 at 13–14.) Plaintiff's allegation is conclusory and unsupported by any record evidence.

[18] That Hilliard, not Dixon, was personally involved in Plaintiff's discipline is unsurprising because Hilliard was Plaintiff's direct supervisor; Dixon supervised Plaintiff only when Hilliard was absent from work. (Dkt. 203 ¶ 45.)

be liable under Section 1983 for First Amendment retaliation.

### iii. Defendants Hilliard and Garnett's Motion for Summary Judgment is Denied because there is Evidence of Suspicious Timing.

To establish a prima facie case for First Amendment retaliation based on an employee's having engaged in protected speech, the plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation because of his employer's action; and (3) his protected activity was a motivating factor for the deprivation. *Milliman v. County of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (cleaned up). Once the plaintiff makes this showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* at 430–31. The burden then shifts back to the plaintiff "to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 431.

Plaintiff alleges that his "union membership and, more significantly, union leadership" was a motivating factor for his suspensions. (*See* Dkt. 201 at 28, 31.) Defendants do not dispute that the First Amendment protects government employees from retaliation based on union membership and leadership. *Clue v. Johnson*, 179 F.3d 57, 60 (7th Cir. 1999) ("There is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."); *Quinn v. Village of Elk Grove Bd. of Fire and Police Com'rs*, 2002 WL 31875464, at *4 (N.D. Ill. Dec. 24, 2002) ("Unions are among the quintessential types of associations the First Amendment [right of] freedom of association protects."). Nor do Defendants dispute that Plaintiff suffered a deprivation when they suspended Plaintiff.

31

Defendants Hilliard and Garnett's sole argument is that Plaintiff cannot show that his Union association was a motivating factor for his 2018 suspensions. (Dkt. 176 at 21.)

The "motivating factor" element requires the plaintiff to show causation, meaning that his protected conduct "caused, or at least played a substantial part in, the employer's decision to take adverse employment action against the plaintiff." *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004) (quoting *Klunk v. Cnty. of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999)). To be a motivating factor, the protected conduct does not need to amount to a "but-for factor or to the only factor," but rather "a factor that motivated the defendant's actions." *Id.*; *see also Deeren v. Anderson*, 72 F.4th 229, 235 (7th Cir. 2023). A plaintiff may prove causation by relying on direct evidence, such as an admission of retaliatory motive, and circumstantial evidence, including "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019).

Plaintiff makes several allegations that are not supported by evidence of record. For example, Plaintiff maintains that the suspensions were pretext for Defendants to implement then-Governor Rauner's anti-union agenda. (Dkt. 201 at 34–35.) Defendants allegedly "conducted a clear and widespread campaign of retaliatory discipline nearly immediately after the Rauner administration's declaration of war on public sector unions." (*Id.* at 35.) Plaintiff notes that he was only suspended at times when Mr. Rauner was governor. (*Id.* at 34.) Plaintiff also

maintains that he "did not objectively violate any rules, regulations or directives of IDOC with which he was charged," and that other Union leaders were similarly disciplined, establishing a pattern of anti-Union behavior by Defendants. (*Id.* at 35–36.) Defendants respond that Plaintiff's suspensions were solely the result of his "inappropriate behavior." (*Id.*)

The record does not support Plaintiff's contention that then-Governor Rauner waged an anti-union disciplinary campaign through Defendants Hilliard and Garnett. To begin, it is not supported by the record that then-Governor Rauner harbored anti-union animus. Plaintiff cites Executive Order 2015-13, which then-Governor Rauner issued in early 2015, as evidence that Mr. Rauner believed public unions to be acting unconstitutionally. (Dkt. 201 at 31.) That Executive Order prohibited state agencies from enforcing "Fair Share Contract Provisions" because they violate state employees' First Amendment rights by forcing them to subsidize public union speech with which they might disagree.[19] (Dkt. 204-5.) But then-Governor Rauner's opposition to compelling state employees to pay certain union fees does not evince a general intent to retaliate against union leaders, as Plaintiff maintains. Plaintiff also alleges that "Rauner pronounced that it was his intent that public unions 'go away' in the State of Illinois." (Dkt. 201 at 31.) But the only evidence Plaintiff cites for then-Governor Rauner's intent is a newspaper article,

---

[19] As defined in the Executive Order, "Fair Share Contract Provisions" are "provisions in collective bargaining agreements that require a State Agency, pursuant to the Illinois Labor Act, to deduct 'fair share' fees from state employees' paychecks and deliver those deductions to the contracting unions." (Dkt. 204-5 at 4.) Then-Governor Rauner's Executive Order stated that such provisions are unconstitutional in the light of the Supreme Court's decision in *Harris v. Quinn*, 573 U.S. 616 (2014).

which reports that another public official said Mr. Rauner made such a statement to him at a dinner in early 2015. (Dkt. 204-8.) Then-Governor Rauner's alleged out of court statement, as retold in a newspaper article, is being offered for the truth of the matter asserted: that then-Governor Rauner did intend to destroy public unions. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (excluding, on summary judgment, statements contained within newspaper article because they are "not being attested" and "are considered less reliable than affidavits or depositions"). This inadmissible hearsay cannot be used to oppose summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Even assuming, however, that then-Governor Rauner was hostile to public unions, Plaintiff's reliance on Mr. Rauner's animus is still misplaced because Plaintiff does not present any evidence that connects Mr. Rauner's general union hostility to Defendants Hilliard and Garnett's specific decisions to suspend Plaintiff in 2018. According to Plaintiff, then-Governor Rauner implemented his anti-union agenda by assigning two lawyers from the Labor and Employment Advisory Division ("LEAD") to IDOC. (Dkt. 201 at 31–32.) LEAD is a "team of top labor and employment lawyers" who advise State agencies "on all labor and employment issues." (Dkt. 204-9.) One of LEAD's goals is to "[i]ncrease the State's ability to discipline employees for misconduct . . . ." (*Id.*) Notwithstanding LEAD's purpose, Plaintiff does not submit any evidence (nor even allege) that Higgerson and Jenkins were involved with Plaintiff's discipline by, for example, advising Defendants Hilliard and Garnett to issue the 2018 suspensions.

Plaintiff relies entirely on timing to establish a link between his discipline and then-Governor Rauner, noting that he was disciplined only while Mr. Rauner was governor. (Dkt. 201 at 36.) But "[s]uspicious timing alone rarely establishes causation" required to prove employment retaliation unless there is "corroborating evidence." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). That Plaintiff's 2018 suspensions occurred during the Rauner administration does not, by itself, support an inference that Hilliard and Garnett were pawns in an alleged anti-union offensive. Moreover, the "campaign of retaliatory discipline" against Plaintiff started before Mr. Rauner took office in January 2015; Plaintiff was first referred for discipline on November 12, 2014, which resulted in his first suspension. (Dkt. 203 ¶ 44.) In short, Plaintiff cannot impute then-Governor Rauner's anti-union agenda to Defendants Hilliard and Garnett by using inadmissible hearsay, speculation, and suspicious timing alone.

Plaintiff also reiterates his argument that the suspensions were pretext for Union retaliation because they were based on false IDOC policy violations. (Dkt. 201 at 32–35.) Plaintiff's contention that the ERHs were kangaroo courts is supported only by Plaintiff's conclusory allegations; no pretext can thus be inferred.

Plaintiff also argues that retaliation may be inferred from the fact that other Union officials were disciplined during the Rauner administration. (*Id.* at 35–36.) Plaintiff points to Percy Coleman, the former Union President, who was disciplined and ultimately terminated in 2018 (Dkt. 212 ¶ 29), and Austin Ware and Alexsei Norton, executive officers of the Union and fellow Parole Commanders, who were

disciplined in 2017 and 2018 (Dkt. 204-12; Dkt. 204-13). Discipline against "other employees in the protected group" may support an inference of retaliation. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008). The relevance (if any) of this so-called "me too" evidence, however, depends on context. *Id.*

No inference of retaliation can be inferred from the "me too" evidence here. All "IDOC employees of the Parole Division, including Plaintiff, are part of [the Union]." (Dkt. 203 ¶ 18.) As a consequence, any discipline Defendants meted out necessarily impacted Union members, meaning no inference of retaliation can be based solely on this fact. *See Armfield v. Potter*, 2012 WL 123547, at *6 (N.D. Ill. Jan. 12, 2012) (no inference of racial discrimination possible based on evidence that other Black employees were fired because "78% of employees . . . were black," which means that "is statistically likely that [fired] employees will be black.").

Plaintiff also does not present evidence that the circumstances surrounding his suspensions and the other Union members' disciplinary actions were "closely related." *Hasan*, 552 F.3d at 529 (cleaned up). Plaintiff was suspended in 2018 for using a state vehicle to attend a Union function during work hours without permission and for falsifying his time. Plaintiff does not even allege that Coleman and Norton were suspended for similar conduct. And although Plaintiff says Ware was disciplined "for the same alleged offenses as [him]," the record is to the contrary: Ware was suspended for negligently supervising parolees with domestic abuse issues, failing to follow up with an absconder parolee, and failing to ensure that an agent made consistent contact with a parolee who eventually died from a drug overdose.

(*See* Dkt. 204-12.)

Despite rejecting much of Plaintiff's proffered evidence on causation, there is still sufficient evidence in the record—namely, suspicious timing surrounding Plaintiff's testimony in the Coleman proceeding—to permit an inference that Plaintiff's Union activities were a motivating factor for his discipline. On August 16, 2018, Plaintiff testified on behalf of Coleman, who was then President of the Union. (Dkt. 204-3 at 54.) A day before Plaintiff testified, Defendants Hilliard and Garnett served Plaintiff with the ERH regarding his falsification of time. (Dkt. 203 ¶ 56; Dkt. 204-3 at 54.) Defendant Garnett also signed off on Hilliard's negative performance review of Plaintiff on August 16, 2018—the same day Plaintiff testified in the Coleman proceeding. (Dkt. 183-12 at 10.)

Suspicious timing alone is rarely enough to establish causation. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). But when the "adverse employment action follows [closely] on the . . . heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Id.* (quoting *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001)). Not one, but two adverse actions—the ERH and negative performance evaluation—occurred within one day of the testimony. *See Spiegla*, 371 F.3d at 941 (A Section 1983 case "does not require an adverse employment action within the meaning of . . . Title VII."); *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982) (minor harassment that could deter exercise of First Amendment rights is actionable for retaliation). Moreover,

Defendants Hilliard and Garnett knew Plaintiff was going to testify because they were named on the Coleman witness list alongside Plaintiff. (Dkt. 204-18.)

Given the close temporal proximity between these two adverse actions and Plaintiff's testimony in support of the Union President, there is a genuine issue of material fact regarding whether Plaintiff's Union activities were a motivating factor for his discipline. Defendants Hilliard and Garnett's motion for summary judgment on Counts III and VII is therefore denied.

### D. Speech Claim Under the Illinois Constitution – Count V

Plaintiff also brings a speech retaliation claim under the State's Constitution, related to his Union activities. (*See* Dkt. 64 ¶¶ 142–154.) The free speech provision of the Illinois Constitution provides that:

> All persons may speak, write and publish freely, being responsible for the abuse of that liberty. In trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense.

Ill. Const. art I, § 4.[20] Defendants seek summary judgment because, they contend, Plaintiff lacks a private right of action for damages under the Illinois Constitution's speech provision. (Dkt. 175 at 22.)

Neither the Supreme Court of Illinois not this State's intermediate appellate courts have yet explicitly addressed whether Section 4 of the Illinois Constitution

---

[20] The Third Amended Complaint refers to Article I, Section 2 of the Illinois Constitution in Count V. (Dkt. 64 ¶¶ 150, 154.) Section 2 is the Illinois Constitution's due process and equal protection provision, not its speech provision. Plaintiff admits in his summary judgment response brief that he intended to reference Section 4, the speech provision, not Section 2. Because the allegations in the complaint make clear that Plaintiff is asserting a speech retaliation claim, the Court analyzes the claim under the speech provision in Section 4.

provides a private right of action for damages. District judges in this Circuit, however, have held that there is no such right of action. *See Mellott v. Sprague*, 334 F. Supp. 3d 916, 922 (C.D. Ill. 2017) ("Plaintiff lacks a private right of action under Article I, Section 4 . . . of the Illinois Constitution"); *Wagner v. Evans*, 2016 WL 397444, at \*5 (N.D. Ill. 2016) (Article I, Section 4 does "not create a private right of action for damages"). This Court agrees that no such right exists under Section 4.

Article I, Section 17 of the Illinois Constitution contains language that explicitly authorizes private rights of action. *See Teverbaugh ex rel. Duncan v. Moore*, 724 N.E.2d 225, 228 (Ill. App. Ct. 2000). Section 17 states, "These rights are enforceable without action of the General Assembly." *Id.* (quoting Ill. Const. art. I, § 17). *Teverbaugh* held that Article I, Section 18 of the Illinois Constitution does not provide a private right of action, finding it "significant" that Section 18 lacked an enforcement provision like in Section 17. *Id.*; *see also Baker v. Miller*, 636 N.E.2d 551, 558 (Ill. 1994) (Because Section 17 says allows enforcement of the rights provided therein, private actions may be brought "in the absence of implementing legislation."). Unlike Section 17, the free speech provision (Section 4) provides no authorization for private actions. Because the drafters of the Illinois Constitution could (and did) permit private actions seeking damages for violations of other rights, the Court will not imply a private right of action for speech violations. Accordingly, summary judgment is granted for Defendants on Count V.[21]

---

[21] Plaintiff cites to *Walinski v. Morrison & Morrison*, 377 N.E.2d 242 (Ill. App. Ct. 1978) for the proposition that private rights of action should be implied in the Illinois Constitution. (Dkt. 201 at 37.) *Walinski*, however, supports a contrary holding because that case recognized an implied right of action in Section 17 based on that provision's explicit authorization of a

## IV.  CONCLUSION

Defendants' motion for summary judgment (Dkt. 175) is granted in part and denied in part. Count IV (age discrimination) is dismissed without prejudice; summary judgment is granted for State Defendants on Count I (race discrimination); and summary judgment is granted for Defendants Dixon and Baldwin but denied for Defendants Hilliard and Garnett on Counts III and VII (First Amendment retaliation).[22] Summary judgment is granted for all Defendants on Count V.

SO ORDERED in No. 18-cv-00282.

Date: May 8, 2024

_____
JOHN F. KNESS
United States District Judge

---

private right of action. *Walinski*, 377 N.E.2d at 619–20. In other words, *Walinski* underscores the significance of the drafters' omission of such an authorization in Section 4.

[22] Defendants also contend that emotion distress and punitive damages are unavailable under Title VII. (Dkt. 175 at 23.) These issues need not be addressed because the ADEA claim is dismissed, and summary judgment is granted for Defendants on the Title VII claim.